

## NUMBER 13-07-00469-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

LIZANDRO BARRIOS,                                                          Appellant,

v.

KING FISHER MARINE SERVICE, L.P.,                                Appellee.

### On appeal from the 197th District Court
### of Cameron County, Texas.

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Garza
### Memorandum Opinion by Justice Yañez

Appellant, Lizandro Barrios, sued his employer, appellee King Fisher Marine Service, L.P. ("King Fisher"), for an injury he sustained while working on a dredging vessel. The jury awarded Barrios $130,000 for past medical expenses. It awarded zero damages, however, for physical pain and mental anguish.[1] By one issue, Barrios contends that the jury's finding of no damages for "pain and suffering" was factually insufficient.[2] We affirm.

---

[1] On appeal, Barrios does not argue that he established any damages for mental anguish.

[2] The jury was asked to determine the "sum of money, if paid now in cash, [that] would fairly and reasonably compensate Lizandro Barrios for his injury, if any, that resulted from the occurrence in question" for past and future "[p]hysical pain and mental anguish."

## I. Background

Barrios worked for King Fisher as a boatman on the Shamrock, a dredging vessel. As a boatman, Barrios's duties included, among other things, rigging lines, securing barges to the Shamrock, and unloading barges. On February 19, 2005, Barrios reported that he injured his left wrist. Barrios went to the Valley Day and Night Clinic (the "Clinic") in Brownsville, Texas, and a cast was placed on his left arm.[3] Barrios returned to work wearing the cast with instructions that he was to "return to light duty."

On March 10, 2005, Barrios reported that he had fallen while walking down the stairs on the Shamrock and injured his left side. According to Barrios, when he fell, he hit his head, arm, and shoulder. After receiving treatment at the Clinic, Barrios began seeing an orthopedic surgeon, Guillermo Pechero, M.D. Eventually, Dr. Pechero concluded that Barrios had a tear in the annular ligament covering the disc in the C5-C6 level of his neck and performed surgery on the area.

Barrios sued King Fisher for negligence. The trial court submitted liability questions on negligence for the March 10 incident; however, Barrios waived submission of an issue regarding the February 19 incident. The jury found that Barrios and King Fisher were each fifty percent negligent. The jury awarded past medical expenses of $130,000 to Barrios; however, the jury found zero damages for future medical care and past and future physical pain, mental anguish, loss of earning capacity, disfigurement, and physical impairment.

Barrios filed a motion for new trial, which the trial court denied. This appeal ensued.

## II. The Evidence

Barrios testified that x-rays revealed that he had fractured his wrist and that the doctor ordered "very simple work" and restricted him from using his left hand. According to Barrios, the "captain, the people in charge of the dredge" told him that he had to go back

---

[3] The issue of whether Barrios fractured his wrist was contested at trial. However, at trial, Barrios chose to not submit the issue of the wrist injury to the jury.

to work and that he would be given "an easy job"; however, Barrios stated he was assigned his former duties as a boatman. Barrios testified that as a boatman, he was told to move the anchors and when he walked down the stairs to do so, he fell and was injured again. Barrios stated that the stairs were wet and slippery.

Barrios testified that "they" ordered him to sit down for a while and "they" made a report. Barrios went home to rest and then returned to work as scheduled. According to Barrios, when he returned to work, he told "the people in charge" that he wanted to see a doctor because he was "bruised where [he] had fallen." Barrios stated that his side hurt because he hit his head, arm, and shoulder. Barrios sought treatment at the Clinic, where a physician told him to go home, rest, and begin physical therapy.[4] Eventually, Barrios sought treatment from Dr. Pechero.

Dr. Pechero testified that he began seeing Barrios on March 22, 2005, and that Barrios complained of pain in the neck and left shoulder. Barrios told Dr. Pechero that he had injured his neck and left shoulder when he fell off a "ladder" while working as a boatman for King Fisher. Dr. Pechero believed that the history provided by Barrios was consistent with the injuries Barrios described. Dr. Pechero stated that he started Barrios on physical therapy and pain medications. According to Dr. Pechero, Barrios continued to complain of pain and that during the first six to ten months of treatment, Barrios did not seem to be improving. Dr. Pechero was concerned because that meant that something was "going on in his neck" and the treatment was not working.

Although Dr. Pechero recalled that an MRI had been performed on Barrios in April of 2005, he did not recall the exact date or the results of the report.[5] A second MRI was

---

[4] Tammy Boyd, the human resource manager for King Fisher, testified that after Barrios fell down the stairs, he was being treated at the Clinic "for a sprained cervical area, which is the neck, and a sprained shoulder." However, according to Boyd, Barrios ended the course of treatment with the Clinic when he stopped showing up for his shift on March 17. Boyd stated that the physical therapy had not been "set up" because Barrios did not return to work. Boyd stated that to her knowledge, Barrios had not undergone physical therapy.

[5] Dr. Pechero explained that an MRI is a device utilizing large magnets that allows doctors to see inside the patient's body.

3

performed on June 1, 2005, allowing Dr. Pechero to view Barrios's neck and discern the vertebral bodies, the discs, and spinal cord. Dr. Pechero opined that the MRI showed that Barrios had a "[b]ulging disc at C5-C6 level."[6] According to Dr. Pechero, a bulging disc can be a problem and can cause pain in the neck.

After hearing Barrios describe pain in his neck and down his left arm and decreased sensation and weakness in the left arm, Dr. Pechero became concerned that the clinical examination was not consistent with the MRI. Dr. Pechero stated that he suspected that something was irritating the nerve and that "[t]here was a progressive problem that wasn't resolving itself," so he ordered a discogram.[7] According to Dr. Pechero, the discogram revealed that Barrios had a torn disc and that he was having pain.[8]

During cross-examination, the following colloquy occurred:

| [King Fisher's counsel]: | Now in these discograms that you've looked at, in the majority of them, if not all of them, you understand that they'll do what they call a Marcaine challenge? |
|---|---|
| [Dr. Pechero]: | Yes. |
| [King Fisher's counsel]: | Can you tell us what a Marcaine challenge is? |
| [Dr. Pechero]: | Well, to see how the patient reacts, we just inject a numbing medication. |
| [King Fisher's counsel]: | Okay. So first you might provoke pain in a certain disc area, right? |
| [Dr. Pechero]: | Correct. |
| [King Fisher's counsel]: | And then in order to make sure that the response is an accurate response, you'll then inject a pain relief medication into the same area, right? |
| [Dr. Pechero]: | Well, they usually inject a dye. I'm not real |

---

[6] Dr. Pechero described that a bulging disc occurs when a ligament that normally holds the gelatinous material of the disc is thinned out or has been torn.

[7] Dr. Pechero explained that a discogram is a procedure whereby a needle is used to inject dye into the disc area to determine if there is a tear in the disc causing pain.

[8] Dr. Pechero stated that a torn disc means that "[t]he fibers that, that sustain the disc, that make up the disc are torn, and the pain fibers in there in turn cause pain."

| | |
|---|---|
| | familiar with how each one of them do it. It may be a little different. |
| [King Fisher's counsel]: | But the Marcaine challenge assists the doctor performing the discogram in making sure that the pain response is a truthful pain response, right? |
| [Dr. Pechero]: | Correct. |
| [King Fisher's counsel]: | Because this is a provocation test, where you're relying upon the subjective complaints of the patient, right? |
| [Dr. Pechero]: | I think part of it is. The other part is objective. |
| [King Fisher's counsel]: | Okay. But there is a portion of it where you inject dye into a disc area in an effort to provoke pain, and if it does provoke pain then the patient is relied upon to say, 'Yes, I'm experiencing pain,' or 'No, I'm not,' correct? |
| [Dr. Pechero]: | Correct. |
| [King Fisher's counsel]: | And then to test whether that was a correct response they'll also inject, then, the Marcaine, which is a pain reliever, that should eliminate that pain, right? |
| [Dr. Pechero]: | Correct. |
| [King Fisher's counsel]: | And so that's how you—that's one way that the doctor doing the test can understand with some greater degree of certainty whether the result of the patient complaining about having pain was a correct response, right? |
| [Dr. Pechero]: | Correct. |

Dr. Pechero agreed that no Marcaine challenge was performed on Barrios and that no other test was performed to establish the accuracy of the discogram. When King Fisher's counsel asked, "[The doctor performing the] discogram . . . relie[d] solely upon [Barrios] stating that he was feeling and experiencing pain in a particular area after the injection?", Dr. Pechero responded, "Correct."

A CT scan of Barrios's neck was taken after the discogram was performed.[9] Dr.

---

[9] Dr. Pechero explained that CT and CAT scans are "x-rays that are taken using the same way you take conventional x-rays, but done at cross-sectional cuts, much thinner."

5

Pechero opined that the CT scan showed leakage of the dye in the middle neck in the C5-C6 level discs. Dr. Pechero explained that the dye leaking out of the disc meant that there was a tear. Dr. Pechero then performed surgery to remove the affected disc. Dr. Pechero stated:

> The disc is removed all the way toward the back. There's a space that is left in. That's replaced with a bone of appropriate height and width. Once the bone is placed in there, the plate is placed on front to secure the bone graft and the plate is held with the screws.

Dr. Pechero testified that although the bone placed in Barrios's neck has not completely healed, Barrios has no more pain and "[n]eurologically, the arm is back" with no weakness or numbness.

On further cross-examination, Dr. Pechero clarified that although Barrios initially complained of shoulder pain and physical therapy was prescribed, that injury "eventually resolved itself" as early as April or June of 2005. Dr. Pechero answered "correct" to the following questions asked by King Fisher's counsel: (1) "[T]here's a difference between objective and subjective right?"; (2) "Subjective, you have to rely to a large extent upon that which is told you by the patient, right?"; and (3) "Whereas objective is something in the form of a diagnostic study that's not reliant upon the patient saying anything; it's there in black and white?" Dr. Pechero also acknowledged that the June 1 MRI did not objectively substantiate Barrios's subjective complaints of pain.

On cross-examination, Dr. Pechero testified that the bulge he saw on the June 1 MRI was a minimum to moderate bulge, that many people have minimal bulges at their C5-C6 level, and that such bulges usually do not impinge upon the nerve roots. Dr. Pechero clarified that although the bulge does not impinge on a nerve, the patient may still suffer from radicular pain—that is, pain radiating down the arm. Dr. Pechero therefore opined that the bulge in Barrios's disc, even if it did not directly impinge the nerve, could have still caused radicular symptoms from other pathology, such as chemicals within the disc leaking out, causing irritation to the nerve.

Dr. Pechero stated that it was possible that the injury he observed on the CT scan

6

could have occurred before the March 10 incident and that he relied on Barrios's description of events to determine the cause of the injury. Dr. Pechero agreed that the CT scan was the first objective diagnostic test that substantiated Barrios's complaints of pain. Dr. Pechero testified he believed that Barrios had an annular tear with an intradiscal dysfunction. Although Dr. Pechero stated that he observed the annular tear on the CT scan, he stated that the intradiscal dysfunction was not seen on any of the tests performed on Barrios. Dr. Pechero explained that an intradiscal dysfunction is diagnosed based on clinical findings. King Fisher's counsel asked, "And by 'clinical findings' you're referring to the patient's subjective complaints of pain and how he responds during examination, right?", to which Dr. Pechero responded, "Correct."

Dr. Pechero recalled that an MRI had been performed on Barrios in April of 2005; however, no report of the MRI was included in his records. After reviewing a report from the doctor who performed the April 12 MRI, Dr. Pechero testified that the report stated it was a "[n]ormal MRI of the cervical spine," and the report did not reference a bulge. Dr. Pechero agreed with the report's findings that there was no bulge or abnormality shown on the April 12 MRI.

Arnulfo R. Garza-Vale, M.D., a neurological surgeon, testified by videotape deposition for King Fisher. Dr. Garza-Vale stated, "Neurosurgery is a subspecialty of surgery that deals with the diagnosis and treatment of conditions of the brain and spine," including traumatic conditions, non-traumatic conditions, brain tumors, spinal tumors, herniated discs in the neck and back, and the entire spinal column. According to Dr. Garza-Vale, a person who has an injury to his or her spinal column can have symptoms in other locations of the body "depending on what's affected. If it's a nerve, for example, in the case of a herniated disc, you can have symptoms that radiate [down] the arm."

Dr. Garza-Vale performed an "independent medical examination" of Barrios on January 31, 2006, and also reviewed the medical records and diagnostic studies performed in this case. Dr. Garza-Vale stated that he reviewed an MRI of Barrios's left shoulder,

7

which he and the radiologist who performed the MRI concluded was normal. Dr. Garza-Vale stated that the only thing he found objectively wrong with Barrios's left shoulder was degenerative changes, which are caused by the course of time and the use of and wear and tear of the shoulder. When Dr. Garza-Vale conducted his independent medical examination of Barrios, Barrios indicated that he could not completely raise either his right or left shoulders up—Barrios could only lift his left shoulder one hundred degrees and his right shoulder about 120 degrees. However, Dr. Garza-Vale was unable to find anything wrong with Barrios's left shoulder from the diagnostic studies that were performed.

Dr. Garza-Vale did not believe that Barrios's complaints of pain to his shoulder were consistent with the March 11 incident. Dr. Garza-Vale explained that Barrios first complained of shoulder pain after the February 11 incident when he injured his wrist. Therefore, because Barrios had symptoms before the March 11 incident, Dr. Garza-Vale was not convinced that Barrios was experiencing "referred" pain to the shoulder from the neck. Dr. Garza-Vale testified that referred pain occurs, for example, when you have an injury to your hand and the pain radiates from your hand to your neck or shoulder. Dr. Garza-Vale did not believe that Barrios suffered any referred pain because "typically referred pain is a neurological pattern" going from proximal to distal and does not usually go from the distal to the proximal. Dr. Garza-Vale explained that

> most nerves have a tendency to cause pain in the distal direction, away from say the neck down the shoulder to the hand. But it's unusual to have pain from the hand back to the neck. There are cases of that type of referred pain, because nerves do have interconnections that go back and forth, but the more typical pain is from proximal to distal.

Dr. Garza-Vale testified that the type of injury Dr. Pechero diagnosed Barrios with is an annular tear with an intradiscal dysfunction. Dr. Garza-Vale explained that

> means that the annulus, which is the ligament that covers the disc material here (indicating), so it's a ligament that is 360 degrees around, and its sort of like a cover, like a wrapping for the center portion of the disc called the nucleus. So when you say that this round structure, the annulus, is broken, now the central portion of the disc or the nucleus can come out and compress cord or nerve root, but you have to have this tear of the annular ligament.

According to Dr. Garza-Vale, Barrios did not suffer an annular tear and nothing was being

8

compressed. Dr. Garza-Vale stated,

> This gentleman had numbness throughout the arm. He had weakness throughout the arm. In fact, he gave very little effort in his examination. He just really didn't do much of anything. And so there was really no clinical exam that correlated with a herniated disc, an annular tear, compressed nerve, none of those features that you normally see in a herniated disc syndrome.

Dr. Garza-Vale testified that the clinical picture that he gathered from Barrios did not match a diagnosis of an annular tear or a diagnosis requiring further treatment or surgery.[10]

Dr. Garza-Vale explained that Barrios complained of bilateral pain and not pain only to the left arm, which does not correlate with herniated disc syndrome. Dr. Garza-Vale stated that Barrios "gave minimal effort" during the exam and had a weak grip. Dr. Garza-Vale testified that there was no reasonable explanation for Barrios's weak grip. According to Dr. Garza-Vale, that raises a "big red flag" that Barrios was "putting on symptoms that [were not] there." Dr. Garza-Vale said that Barrios would not raise his arms above shoulder level and that meant Barrios was not giving any effort. Dr. Garza-Vale stated, "This gentleman had—had—he was well muscled, let's put it that way. He did not have tiny arms. And a fellow that's that well muscled that can't raise his arms up, that's pretty remarkable." According to Dr. Garza-Vale, that symptom was inconsistent with a herniated disc, and if Barrios had a problem at the C5 or C6 level, "he would have had comfort by lifting his arms up."

Dr. Garza-Vale opined that if a patient had a problem with the C5-C6, over time, one would see atrophy of the muscles—the biceps would become weaker and would shrink. However, in Barrios's case, Dr. Garza-Vale observed that Barrios's right and left muscles were identical and there was no atrophy. Dr. Garza-Vale believed this meant that the nerves were working fine on both sides. Dr. Garza-Vale said that he tested Barrios's reflexes, which "basically test[s] the same nerve not once but really three or four times" for sensation, motor function, reflex function, and for "any signs that the nerve is—is

---

[10] Dr. Garza-Vale stated that "[t]he clinical picture is set forth by the patient's subjective symptoms"; therefore, he relies on the patient's truthfulness.

compressed and you can't stretch that nerve." Dr. Garza-Vale stated that Barrios's reflexes were normal, which did not correlate with Barrios's complaints of numbness, and the size of his arm. On re-direct examination, Dr. Garza-Vale stated,

> There was nothing that indicated a disruption of the annular ligament. On the contrary, [Barrios] had pain only when he flexed his neck and not when he extended his neck, which is just the opposite of—of a typical herniated disc syndrome. They get pain going back, not forward. . . . He had initially normal exams times two from his own treating doctor. And then suddenly, all of a sudden he now has an abnormal exam. The doctor lists abnormalities in certain muscle groups, but doesn't say if they're right side or left side, doesn't say to what degree. We normally see weakness, for example from zero to five. So if someone has weakness, you say four [over] five, three over five, two over five or zero over five if they can't move at all. But—but you specify, and then you put down it's left side or right side. He just says there's weakness in the muscles blah, blah, blah, but doesn't say where, which ones.

According to Dr. Garza-Vale, an annular tear is recognized by neurosurgeons as a proper diagnosis; however, an annular tear can be seen in an MRI and will typically correlate with appropriate clinical symptoms. Dr. Garza-Vale testified that the clinical picture must correlate with the diagnostic studies and that a doctor must review them both. Dr. Garza-Vale explained:

> The reason you look at both is because they should correlate very closely. If you have an annular tear, the annular tear typically will be lateralized to the left or to the right. And so the patient should have symptoms therefore that go to the left if the annular tear is on the left. If there's compression of nerve on the left, you should therefore get symptoms on the left. And the symptoms should go in the appropriate location, say C6 to the thumb, or at least to the biceps area. It may not have to radiate all the way to—to the thumb, but it should have very specific correlation.

Dr. Garza-Vale stated that he did not see an annular tear on the April 12 MRI studies performed on Barrios. When asked what he found abnormal on the June 1 MRI studies, Dr. Garza-Vale stated, "Nothing. There's the tiniest little bulge there. I would admit it just bulges ever so slightly, but that's normal. Most people if you look at their MRIs and look hard enough, you're going to see a bulge. . . . It's quite common to see a bulge on normal asymptomatic people." Dr. Garza-Vale stated that he would not have performed surgery on the bulge seen in the MRI. Dr. Garza-Vale opined that a doctor must be able to separate a normal bulge from a pathologic abnormality. He stated, "The difference

10

between the two is you need to see nerve compression, not a tiny bulge. If you go after that, you might as well start operating on everybody, just line them up."[11]

Dr. Garza-Vale explained the discogram procedure as follows:

A discogram is a study where a needle is positioned into the disc, usually with the patient in—in a supine position. So, in other words, he's laying down on a table. And you're basically putting your hands here (indicating[)], and moving the trachea and esophagus to one side as you put a needle on the opposite side. You're basically trying to get the esophagus out of the way, so you're going at an angle. Once you have localized the needle in the appropriate place or discs that you want to study, you then inject them with an iodine containing material. And the idea is to see if—if the ligaments, the annular ligaments that we say cover that central portion of the disc have a tear and produce a leak. So you'll see the dye go through the annular tear and typically go again to one side or the other, but not centrally.

. . .

You sometimes can get the dye to trail where you had the needle and so you'll—you'll get dye to come out, but its coming anterior (indicating), this way, instead of posterior. The tears we are looking for are posterior.

. . .

You're injecting an iodine-containing material into the disc space under pressure and then seeing does the patient get reproduction of symptoms, for example, does he get relief of symptoms if you inject an anesthetic there, and do you get extravasation of dye where the dye has come out through a tear such that it lateralizes to the right or to the left consistent with the clinical symptoms, left arm pain, right arm pain.

. . .

In a normal discogram . . . . [t]he—the liquid would be contained just centrally. It tends to get near the edge however, the posterior edge. Depending on your age, it tends to get closer and closer to the posterior edge because the annulus is thinnest on the back wall.

Dr. Garza-Vale testified that the North American Spine Association stated in its journal that it did not recommend cervical discograms such as the one performed on Barrios. That association only recommended lumbar discograms. But in either case, it recommended against a discogram if the patient had a normal MRI. Dr. Garza-Vale explained:

_____

[11] On cross-examination, Dr. Garza-Vale agreed that some annular tears would not be seen on the MRIs taken in this case because of the quality of the image.

> The difference [between a lumbar discogram and a cervical discogram] is that you really don't have a spinal cord down in the lower end of the spinal canal, so it's a lot safer to do a [lumbar] discogram. If it leaks, it leaks. It's not going—going to harm the spinal cord. There is no spinal cord there. But in the neck you have some very important venous structures that can connect the disc to the venous circulation of the cord, and hence, you can get the dye—if you inject it hard enough, you can get it into the cord. And when you do that, you damage the cord.

Dr. Garza-Vale testified that he would never have recommended a cervical discogram for Barrios.

Dr. Garza-Vale believed the discogram has several problems. First, there are many false positive and negative results; and therefore, it is not a very reliable test. "The discogram is reliant upon, first of all, the patient telling you, yes, I feel pain. Well, sometimes you have a patient say ouch at every level. Sometimes he'll say, well, I don't feel anything. So it just—there's too much variability and too little reproducibility to make it a truly objective examination." Next, typically, as people age, discs become more porous and leak, and that leak, according to Dr. Garza-Vale, means nothing. According to Dr. Garza-Vale, a Marcaine Challenge may be performed to increase a discogram's reliability. It is

> a local anesthetic that is used, first of all, to determine if the patient says, oh, that reproduced my symptoms when you inject [the dye] and put pressure on that annulus by pushing on that syringe. You then take that syringe out, change it and put in Marcaine, which is a local anesthetic, and should reduce the pain from the annular tear when you inject the anesthetic. And the patient would say, my pain is gone; I feel much better. It's a confirmation that that is an abnormal disc and that it is the appropriate location of the source of that person's pain.

Dr. Garza-Vale opined that if the patient continues to complain of pain, then the pain is not in that location, the pain is from another source, or it is psychogenic. The fact that a Marcaine challenge was not performed when Barrios had his discogram caused Dr. Garza-Vale to believe that the discogram's reliability and objectivity were reduced.

Dr. Garza-Vale testified that he did not see any evidence of an annular tear on the CT scan performed on Barrios after the discogram. Dr. Garza-Vale stated, "What I see is the dye comes close in contact or is central where the annulus is the thinnest. And so you

see a little knuckle of dye go right up to the edge centrally . . . . [Y]ou can see a little knuckle of dye go right up to the edge and stay there. It doesn't come out, so its not extruded." According to Dr. Garza-Vale, the CT scan showed a normal annular bulge just as the MRI had shown and the dye was not coming through the ligament, but "staying right at the edge of the ligament." When asked if there was anything on the CT scan that suggested that Barrios had an annular tear, Dr. Garza-Vale replied, "Nothing." Dr. Garza-Vale also stated that the first MRI and second MRIs, and the discogram all looked normal to him.

### III. STANDARD OF REVIEW AND APPLICABLE LAW

In considering the factual sufficiency of the evidence where as here, "only one category of damages is challenged on the basis that the award in that category was zero or was too low, a court should consider only whether the evidence unique to that category is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias."[12] We review the entire record and consider evidence both favorable and contrary to the verdict to determine whether the jury's negative finding is against the great weight and preponderance of the evidence.[13] To reverse a judgment due to factually insufficient evidence, we must

> detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, [we], in [our] opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.[14]

### IV. DISCUSSION

Barrios contends the jury's finding of zero damages for pain and suffering is against the great weight and preponderance of the evidence. Barrios argues that the jury was not

---

[12] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 775 (Tex. 2003).

[13] *Monroe v. Grider*, 884 S.W.2d 811, 820 (Tex. App.–Dallas 1994, writ denied).

[14] *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

"free to disregard pain and suffering" because there was evidence that he sustained objective injuries of a fractured wrist and "severe annular tears to a cervical disc." Although Barrios points to evidence that he fractured his wrist, the jury was not asked to determine damages based on that incident and was only asked to determine whether he sustained damages from the March 11 incident wherein he allegedly sustained the neck injury.[15]

Barrios alleges that the evidence, including his medical records, substantiate an objective injury. Dr. Pechero and Dr. Garza-Vale both relied on Barrios's description of his symptoms, two MRI studies, a discogram, and a CT scan to formulate their opinions regarding Barrios's injury.

The first MRI taken on April 12 was normal, according to Dr. Garza-Vale. Dr. Pechero testified that the doctor who performed the MRI reported that it was a "[n]ormal MRI of the cervical spine." Dr. Pechero acknowledged that the April 12 MRI did not show a bulge or any other abnormality. Although Dr. Pechero found a bulge on the June 1 MRI, he agreed that it was possible that the bulge could have occurred before or after the March 10 incident. Dr. Pechero stated that he based his opinion on when the injury occurred on the information provided by Barrios. Dr. Garza-Vale admitted that there was a small bulge visible on the June 1 MRI, but he asserted that it was normal to see those types of bulges on MRIs, even in asymptomatic individuals.

Dr. Garza-Vale opined that one would see an annular tear in an MRI. However, no evidence was presented that the annular tear could be observed on the MRIs taken of Barrios's neck. Dr. Pechero testified that he could not "tell" whether Barrios had an annular tear from the June 1 MRI and as stated above, found that the April MRI was normal. When asked whether the bulge he observed on the June 1 MRI was what led him to order the

_____

[15] Outside the presence of the jury, at a charge conference with the trial court, Barrios's counsel stated, "The plaintiff is not going to submit a separate or any question with regard to the first accident." Question number one in the charge asked, "Did the negligence as defined above under the Jones Act, if any, of those named below cause the incident of March 2005?" The jury was instructed to determine the amount of damages if it "answered Question No. 1 . . . 'Yes' for King Fisher Marine, L.P." Specifically, the jury was asked to award damages, if any, for past and future pain and mental anguish. We note that throughout his brief, appellant refers to the damages he complains of as "pain and suffering."

14

discogram, Dr. Pechero responded, "I think it was more the persistent pain that he had that kind of led me to continue to work him up to see what was really causing his discomfort." Dr. Pechero believed that he would have performed the discogram based on the clinical findings alone, even if he had not seen the bulge on the MRI.

Barrios asserts that the discogram confirmed that he had an annular tear and that it provided objective results that "could not be faked by subjective complaints of pain." However, Dr. Pechero agreed that when performing a discogram, the doctor relies on the patient's complaints of pain and that the doctor who performed the discogram on Barrios relied solely on Barrios's statements that he felt pain in a particular area after the injection. Dr. Garza-Vale testified that the discogram is highly unreliable because the test is based on what a patient tells the physician regarding the pain he is experiencing; therefore, it is not a truly objective examination. Dr. Garza-Vale opined that because a discogram is based on subjective complaints of pain and is unreliable, doctors can perform a Marcaine Challenge or pressure testing to confirm the patient's complaints of pain. However, no such testing was performed to confirm Barrios's complaints that he felt pain during the discogram.

Dr. Pechero stated that the CT scan was the first objective diagnostic test that substantiated Barrios's complaints of pain due to an annular tear—a test Dr. Garza-Vale testified contained no evidence of an annular tear.[16] Although Dr. Pechero stated that the CT scan was objective evidence of the annular tear, Dr. Garza-Vale disputed that conclusion. The remaining evidence of Barrios's pain was of a subjective nature.[17]

Barrios argues that he "testified directly as to the pain he had experienced"[18] and

---

[16] Dr. Pechero testified that the intradiscal dysfunction could not be observed on the CT scan and usually is visible on MRIs; however, no evidence was presented that the MRIs taken showed an intradiscal dysfunction.

[17] Barrios's mother, father, and wife each testified that Barrios was still experiencing pain after his neck surgery.

[18] We note that on direct examination, Barrios did not describe the pain he has experienced as a result of the alleged injury. The only reference to pain made by Barrios is when he stated that he was hurting after the fall because he hit his head, arm, shoulder, and entire left side.

15

the fact that the surgery relieved his complaints of pain bolsters the existence of an annular tear. However, Dr. Garza-Vale testified that Barrios was "putting on symptoms that [were not] there." In addition, Dr. Garza-Vale stated that the clinical symptoms that Barrios described did not correlate with an annular tear. Dr. Pechero testified that after the surgery, Barrios's neck pain was gone and Barrios felt "good." Dr. Pechero stated that neurologically, Barrios's "arm [was] back" and his weakness and numbness were gone. However, Barrios testified on cross-examination that he feels "bad" and when asked if Dr. Pechero was "wrong" when he stated Barrios was "pain free," Barrios replied, "Yes."

"To uphold a jury's finding that an injured party incurred no damages for past pain and suffering, the jury must have found by a preponderance of the evidence that no pain and suffering accompanied the injury."[19] The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony; therefore, "an appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge."[20] Here, the jury was free to believe or disbelieve Barrios's subjective complaints of pain as well as the testimony of any other witness, including Dr. Pechero—who, in this case, primarily relied on what Barrios told him.[21] We accept and will not interfere with the jury's resolution of any conflicts or inconsistencies in the evidence in determining the sufficiency of the evidence.[22]

A jury finding that the plaintiff suffered no past pain and suffering is against the great

---

[19] *Lamb v. Franklin*, 976 S.W.2d 339, 341 (Tex. App.–Amarillo 1998, no pet.).

[20] *Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008).

[21] *See Walker v. Ricks*, 101 S.W.3d 740, 748 (Tex. App.–Corpus Christi, 2003, no pet.) (providing that a jury may "disbelieve a witness, including a physician, even though his testimony is not contradicted"); *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.–Beaumont 2001, pet. denied) ("The judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry. We believe that the presence or absence of pain, based on the subjective complaints of an individual, is not a subject for experts or skilled witnesses alone.") (internal citations omitted).

[22] *See Walker*, 101 S.W.3d at 750.

and preponderance of the evidence when there is uncontroverted evidence of an objective injury.[23]  However, in this case, evidence that Barrios suffered an objective injury—an annular tear—was controverted by Dr. Garza-Vale's testimony that the CT scan was normal, and the remaining evidence of Barrios's damages for physical pain were entirely subjective—that is, based on Barrios's complaints of pain to Dr. Pechero and others.[24] Therefore, after reviewing all of the evidence, we cannot conclude that the evidence supporting the jury's finding of zero damages for physical pain is against the great weight and preponderance of the evidence.[25]  We overrule Barrios's sole issue.

## IV. CONCLUSION

We affirm.

LINDA REYNA YAÑEZ,
Justice

Delivered and filed the
27th day of May, 2010.

---

[23] *Monroe*, 884 S.W.2d at 820 (citing *Hammett v. Zimmerman*, 804 S.W.2d 663, 664-65 (Tex. App.–Fort Worth 1991, no writ)).

[24] *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 775 (explaining and approving the court's conclusion in *Monroe* that the "jury could not ignore uncontroverted evidence of injury in denying recovery for past physical pain"); *see also Luna v. Torres*, No. 13-07-00471-CV, 2009 Tex. App. LEXIS 6972, at *12 (Tex. App.–Corpus Christi Aug. 31, 2009, no pet.) (mem. op.) ("A jury may award 'zero damages' when the injuries sustained are subjective in nature or there is both subjective and objective evidence of damages."); *Biggs v. GSC Enters., Inc.*, 8 S.W.3d 765, 768-69 (Tex. App.–Fort Worth 1999, no pet.) (stating that "[a]ppellate courts are reluctant to overturn jury findings of no damages for pain and suffering when the indicia of injury and damages are more subjective than objective").

[25] *See Monroe*, 884 S.W.2d at 820.

17